## BOEHM v. UNITED STATES.
### No. 11799.

Circuit Court of Appeals, Eighth Circuit.

Nov. 16, 1941.

Rehearing Denied Nov. 26, 1941.

792

John S. Leahy and William O'Herin, both of St. Louis, Mo. (McMahon, Dean & Gallagher, of Washington, D. C., on the brief), for appellant.

Herbert S. French, Sp. Asst. to the Atty. Gen., and Harry C. Blanton, U. S. Atty., of Sikeston, Mo. (James R. Sharp and George Jaffin, Sp. Attys., Department of Justice, both of Washington, D. C., and Russell Vandivort, Asst. U. S. Atty., of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken to reverse the conviction and sentence of appellant upon counts 4 and 5 of an indictment duly returned against him. He was acquitted on counts 1, 2 and 3. Counts 4 and 5 charged perjury committed by the defendant in violation of 18 U.S.C.A. § 231, which reads as follows:

"Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify * * * truly * * * shall willfully and contrary to such oath state * * * any material matter which he does not believe to be true, is guilty of perjury * * *". The stat-ute "takes the place of the similar provision of § 5392 of the Revised Statutes, which in turn was a substitute for a number of statutes in regard to perjury, and was phrased so as to embrace all cases of false swearing, whether in a court of justice or before administrative officers acting within their powers." United States v. Smull, 236 U.S. 405, 35 S.Ct. 349, 59 L.Ed. 641.

The Fourth Count of the indictment charged: "that Union Electric Company of Missouri is a corporation organized and existing under and by virtue of the laws of the State of Missouri and at one time was known as and called Union Electric Light and Power Company; that on or about the 29th day of May, 1937, the name of said corporation was duly changed from Union Electric Light and Power Company to Union Electric Company of Missouri, and hereinafter in the several counts of this indictment said corporation at all times will be referred to as Union Electric Company of Missouri; that heretofore and on or about the 7th day of June, A. D. 1939, an order was duly made at a regular session of the Securities and Exchange Commission held at its offices in the City of Washington, in the District of Columbia, authorizing and instituting an investigation pursuant to sections 19(a) and 20(a) of the Securities Act of 1933 [15 U.S.C.A. §§ 77s(a), 77t(a)], Section 21(a) of the Securities Exchange Act of 1934 [15 U.S. C.A. § 78u(a)], and Sections 18(a) and (b) of the Public Utility Holding Company Act of 1935 [15 U.S.C.A. § 79r(a, b)], into certain acts and practices and the business and financial condition of the said Union Electric Company of Missouri, its subsidiary companies, and the St. Louis County Gas Company, said Union Electric Company of Missouri at that time having securities registered under the Securities Act of 1933, having registered securities on a national securities exchange under the Securities Exchange Act of 1934, and being a holding company within the meaning of the said Public Utility Holding Company Act of 1935 and a subsidiary company of The North American Company, a registered holding company within the meaning of said Public Utility Holding Company Act of 1935; that during all of the period of time from January 1, 1930 until on or about May 15, 1939, said defendant, Frank J. Boehm, was Vice-President and a director of said Union Electric Company of Missouri; that in said order said investi-

gation was directed to be for the purposes, among others,

"of determining whether said Union Electric Company had violated or was about to violate Section 24 of the Securities Act of 1933 [15 U.S.C.A. § 77x],

"of determining whether said Union Electric Company of Missouri had violated or was about to violate Section 32(a) of the Securities Exchange Act of 1934 [15 U.S. C.A. § 78ff(a)],

"of aiding in prescribing rules and regulations pursuant to Sections 7, 10(b), and 19(a) of the Securities Act of 1933 [15 U. S.C.A. §§ 77g, 77j(b), 77s(a)], Sections 12 and 13 of the Securities Exchange Act of 1934 [15 U.S.C.A. §§ 78l, 78m], and Sections 3(b), 6(b), 7, 12, 13, 15, 17(c), and 20(a) of the Public Utility Holding Company Act of 1935 [15 U.S.C.A. §§ 79c(b), 79f(b), 79g, 79l, 79m, 79o, 79q(c), 79t(a)],

"of securing information to serve as a basis for recommending further legislation concerning any matters to which said Public Utility Holding Company Act of 1935 relates, and

"of determining whether said Union Electric Company of Missouri had violated or was about to violate Sections 12(h) and 29 of the Public Utility Holding Company Act of 1935 [15 U.S.C.A. §§ 79l(h), 79z—3];

"that said order of said Securities and Exchange Commission designated Paul J. Cotter and Harry C. Coles, Jr., among others, as officers of said Commission to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence in said investigation, and to perform all other duties in connection therewith authorized by law.

"That thereafter the said investigation duly authorized and instituted by the said Securities and Exchange Commission was conducted in the City of St. Louis, State and Eastern District of Missouri, in the Eastern Division of said District, and within the jurisdiction of this Court, by said Securities and Exchange Commission acting through competent officers thereof who were duly designated as aforesaid, and said Commission then and there had full and competent power and jurisdiction to conduct said investigation; that thereupon the facts and circumstances surrounding

"the padding of officers' and employees' expense accounts submitted to and paid by said Union Electric Company of Missouri or its subsidiary companies, and the inclusion of therein of sums not actually expended for or on behalf of said companies, or expended for purposes other than those designated upon said expense accounts,

"the securing of sums of money in cash by officers of said Union Electric Company of Missouri or its subsidiary companies by means of secret rebates and kick backs from persons, firms, and corporations with whom said Union Electric Company of Missouri and its subsidiary companies dealt.

"the creation and maintenance by officers of said Union Electric Company or its subsidiary companies of a sum of money in cash or of a slush fund,

"the making of political contributions by or on behalf of said Union Electric Company of Missouri or its subsidiary companies,

"the connection of said defendant, Frank J. Boehm, with said transactions and practices, and

"the accuracy of registration statements or financial statements filed by said Union Electric Company of Missouri and said The North American Company with the Securities and Exchange Commission, pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Public Utility Holding Company Act of 1935,

"among other matters, became and were then and there material matters in said investigation.

"That thereafter during the course of said investigation, and on or about the 10th day of July, A. D. 1939, in the City of St. Louis, in the State of Missouri, and within the jurisdiction of this Court, Frank J. Boehm, the defendant herein, duly appeared as a witness in said investigation before the said Harry C. Coles, Jr., a competent officer of said Securities and Exchange Commission, and then and there took an oath administered to him by said officer that all of the testimony which he would give in said investigation would be the truth, the whole truth, and nothing but the truth; that said Harry C. Coles, Jr., the aforesaid officer, was then and there a competent person to administer said oath and that said investigation by said Securities and Exchange Commission was a case in which a law of the United States authorized an oath to be administered;

"That on or about the said 10th day of July, 1939, Frank J. Boehm, the defendant

herein, being then and there under oath as aforesaid, unlawfully, wilfully, knowingly, feloniously, and contrary to said oath did falsely testify to material matters in said investigation which he did not believe to be true, in substance and effect, as follows:

"(a) That he did not pad his own expense accounts and that the expense accounts submitted by him to the Union Electric Company of Missouri corresponded exactly with what his expenses were, as nearly as he could make them;

"(b) That he took all of the trips that were listed on his expense vouchers submitted to said Union Electric Company of Missouri for the period from 1933 to the end of 1938;

"(c) That a fund in cash of any sort had never been maintained by the said Union Electric Company of Missouri for political or other purposes; that any cash in his office, or on his person, or in his safe was his personal fund;

"(d) That no money was obtained by Union Electric Company of Missouri or its subsidiary companies, or officers or employees thereof, by means of kick backs or rebates from attorneys employed by said companies;

"That on the contrary it was the truth and fact, and said defendant, Frank J. Boehm, then and there well knew and believed:

"(a) and (b) That expense accounts submitted by him to said Union Electric Company of Missouri and paid by said company during the period from 1933 to the end of 1938 had been and were padded, and that trips listed on his expense vouchers as having been made by him during said period of time had not in fact been made by him;

"(c) That a large fund in cash was maintained by said Union Electric Company of Missouri for political and other purposes, said fund being maintained in the possession and under the control of said Frank J. Boehm in his office, on his person, and in his safe, which money was not his personal fund;

"(d) That for a long period of time, including the years from 1932 to 1939, the Union Electric Company of Missouri and its subsidiary companies and officers and employees thereof had received secret rebates and kick backs from attorneys with whom said Union Electric Company of Missouri and its subsidiary companies

dealt, including Bradshaw, Schenk & Fowler, Rex H. Fowler, Benjamin P. Alschuler, Guy C. McMillan, and other persons to the Grand Jurors unknown.

"That the matters to which the said defendant, Frank J. Boehm, falsely testified as aforesaid were matters material to said investigation then pending before the said Securities and Exchange Commission as aforesaid.

"Contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America."

In the fifth count the false swearing was charged to have been done on the eleven day of July, 1939, under oath administered by the same person in the same proceedings, it being charged that the defendant had made false oath as follows:

"(a) That there was no practice of obtaining money by means of kick backs, rebates, or through any other mechanics, through purchases made by Union Electric Company of Missouri or its subsidiary companies of materials from supply companies, and that no money was derived by or on behalf of said Union Electric Company of Missouri or its subsidiary companies off the record or in any other manner for a slush fund;

"(b) That he had never made any political contributions or any loans or contributions to any candidate for public office for or on behalf of said Union Electric Company of Missouri or its subsidiary companies;"

After plea in abatement, demurrer and motion to quash had been overruled, the defendant plead not guilty.

It was shown on the trial that in October of 1938 the Securities and Exchange Commission had received information which indicated that the Union Electric Company of Missouri, a public utility company, had engaged for a long time in the practice of collecting a fund of money in cash, or a slush fund, by means of rebates from attorneys and supply companies and by means of padded expense accounts, and that the fund was used for various political purposes and the order made and entered by the Commission at its regular session on the 7th day of June 1939 referred to in the indictment was received in evidence. The order directed the investigation in which the defendant was charged with having committed perjury, and as it con-

tains the inducements leading to its issuance by the Commission and the findings and conclusion of necessity therefore, and contains specific reference to the particular sections of the statute upon which each direction of the order was based, we set it out in full as follows:

"It appearing to the Commission that Union Electric Company of Missouri is a holding company with twelve or more subsidiary companies doing business in the States of Missouri, Illinois and Iowa, and that these companies, as a holding company system, transmit electric energy across state lines in interstate commerce; and that the Union Electric Company of Missouri, as a holding company, has applied to the Commission for exemption under Section 3(a) of the Public Utility Holding Company Act of 1935, [15 U.S.C. A. § 79c(a)] which application is now pending before the Commission; and

"It further appearing to the Commission that Union Electric Company of Missouri is a subsidiary of The North American Company, and was, until February 8, 1939, a subsidiary of the North American Edison Company, both registered holding companies within the meaning of the Public Utility Holding Company Act of 1935, and

"It further appearing to the Commission that Union Electric Company of Missouri, North American Edison Company and The North American Company, each has registered securities on one or more national securities exchanges under the Securities Exchange Act of 1934; and

"It further appearing to the Commission that Union Electric Company of Missouri and The North American Company each has securities registered under the Securities Act of 1933; and

"It further appearing to the Commission that Union Electric Company of Missouri, pursuant to the aforesaid registrations and in support of the aforesaid application for exemption, has filed financial statements, balance sheets, profit and loss statements, income accounts and other reports of operations with the Commission for the years 1934, 1935, 1936, 1937 and 1938; and

"It further appearing to the Commission that the St. Louis County Gas Company is a subsidiary of The North American Company, is an associate company of Union Electric Company of Missouri, and has substantially the same executive officers as Union Electric Company of Missouri; and

"It further appearing to the Commission that North American Edison Company and The North American Company, pursuant to the aforesaid registrations have filed with the Commission financial statements, balance sheets, profit and loss statements, income accounts and other reports of operations for the years 1933, 1934, 1935, 1936, 1937 and 1938, which reports are based, in part, upon financial statements, balance sheets, profit and loss statements, income accounts and other reports of operations furnished to said companies by Union Electric Company of Missouri, and/or the St. Louis County Gas Company, which information became and becomes a basis for, and was and is incorporated in applications, reports, documents, accounts and records filed and kept under the provisions of the Public Utility Holding Company Act of 1935; and

"The Commission having reasonable grounds to believe that for a long period of time, and more particularly since January 1, 1933, Union Electric Company of Missouri, its subsidiaries and the St. Louis County Gas Company, directly or indirectly, have collected through their officers and others sums of money from employees, officers, directors, attorneys, contractors and other individuals and companies by means of padded expense accounts, kick-backs, rebates and otherwise, which collections are not properly contained in or reflected on the books, records or accounts of Union Electric Company of Missouri, its subsidiaries and said associate company, and

"The Commission having further reasonable grounds to believe that for a long period of time, and more particularly since January 1, 1933, the books, records and accounts of Union Electric Company of Missouri, its subsidiaries and the St. Louis County Gas Company, contain entries purporting to show various charges for goods, services and expenses, which were not incurred for the purposes set forth in said books, records and accounts, and

"The Commission having further reasonable grounds to believe that for a long period of time, and more particularly since January 1, 1933, Union Electric Company of Missouri, its subsidiaries and, the St. Louis County Gas Company, directly or indirectly, made contributions through their officers and others in connection with the candidacy, nomination, election or appointment of various persons for or to offices and positions in the Government of

States, political sub-divisions of States, or agencies, authorities and instrumentalities of the foregoing; and made contributions to or in support of political parties, committees and agencies thereof; and that the amounts and designations of these contributions are not reflected on, entered in or shown by the books, records and accounts of said companies, and

"The Commission having further reasonable grounds to believe that for a long period of time, and more particularly since January 1, 1933, Union Electric Company of Missouri, its subsidiaries and the St. Louis County Gas Company, through their officers and others, directly or indirectly expended money to influence the official conduct of public officials, which expenditures are not reflected on, entered in or shown by the books and records of said companies, and

"The Commission having further reasonable grounds to believe that for a long period of time, and more particularly since January 1, 1933, Union Electric Company of Missouri, through its officers and others, directly or indirectly expended money in entertaining public officials and the families of its officers, and for the personal purposes of its officers, and that these expenses have been in some instances made to appear as assets on the books of the company, and in other instances charged to subsidiaries, some of which received no benefit therefrom; and

"The Commission having further reasonable grounds to believe that for a long period of time, and more particularly since January 1, 1933, Union Electric Company of Missouri, its subsidiaries and the St. Louis County Gas Company, through their officers and others, directly and indirectly, have received various sums of money, which receipts are not properly entered on the books, records and accounts of said companies, and have expended various sums of money, which expenditures are not entered in or otherwise properly reflected on the books, records and accounts of said companies, and

"The Commission having further grounds to believe that as a result of the aforesaid practices and activities the financial statements, balance sheets, profit and loss statements, income accounts and other reports of operations filed with the Commission by Union Electric Company of Missouri pursuant to the aforesaid registrations and the aforesaid application for exemption were false and misleading with respect to various items of receipts and expenditures; and

"The Commission having further reasonable grounds to believe that as a result of the aforesaid practices and activities of Union Electric Company of Missouri, its subsidiaries, and the St. Louis County Gas Company, the financial statements, balance sheets, profit and loss statements, income accounts, and other reports filed with the Commission by the North American Company and/or North American Edison Company were false and misleading; and

"The Commission having further reasonable grounds to believe that Union Electric Company of Missouri has violated the provisions of Section 24 of the Securities Act of 1933, of Section 32(a) of the Securities Exchange Act of 1934, and of Sections 12(h) and 29 of the Public Utility Holding Company Act of 1935, and that the St. Louis County Gas Company has violated Sections 12(h) and 29 of the Public Utility Holding Company Act of 1935; and

"It further appearing to the Commission to be necessary and appropriate to determine the extent to which receipts or expenditures of Union Electric Company of Missouri, its subsidiaries and the St. Louis County Gas Company have been improperly entered on or omitted from the books, records and accounts of said companies since January 1, 1933, and have been reported to The North American Company and/or North American Edison Company and the extent to which the acts and practices hereinbefore mentioned may have falsified, distorted or otherwise made incorrect financial statements, balance sheets, profit and loss statements, income accounts or other reports of operations filed with the Commission by The North American Company or North American Edison Company for the said period,

"It Is Ordered, pursuant to Sections 19 (a) and 20(a) of the Securities Act of 1933, Section 21(a) of the Securities Exchange Act of 1934 and Sections 18(a) and 18(b) of the Public Utility Holding Company Act of 1935, that an investigation be made of the Union Electric Company of Missouri, its subsidiaries and the St. Louis County Gas Company, to determine the facts, conditions, practices and matters above referred to, to aid (1) in the enforcement of each of said Acts; (2) in prescribing rules and regulations pursuant

to provisions of Sections 7, 10(b) and 19 (a) of the Securities Act of 1933, Sections 12 and 13 of the Securities Exchange Act of 1934, and Sections 3(a), 6(d), 7, 12, 13, 15, 17(c), 20(a) and 23 of the Public Utility Holding Company Act of 1935, and other pertinent provisions of each of said Acts; and (3) in securing information to serve as a basis for recommending further legislation concerning any matters to which any of such Acts relate, as may appear to the Commission to be necessary and appropriate; and to determine whether or not there have been violations of the provisions of Section 24 of the Securities Act of 1933, of Section 32(a) of the Securities Exchange Act of 1934 and of Sections 12 (h), and 29 of the Public Utility Holding Company Act of 1935, and

"It Is Further Ordered, pursuant to Section 19(b) of the Securities Act of 1933, Section 21(b) of the Securities Exchange Act of 1934, and Section 18(c) of the Public Utility Holding Company Act of 1935, for the purposes of such investigation, that Paul J. Cotter, James R. Sharp, Harlan B. Collins, Harry C. Coles, Jr., George Jaffin and William V. Holohan, together with such other officer or officers as the Commission may hereafter appoint or substitute, and each of them be and they hereby are designated officers of this Commission, and are hereby empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, require the production of any books, papers, correspondence, memoranda or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith authorized by law; and

"It Is Further Ordered that such investigation begin and continue at such times and places as such officers, or any of them, shall designate,

"By the Commission.

"Francis P. Brassor,
"Secretary."

The appellant contends in this court, as he did in the court below, that the oath he took and the testimony he gave before the above named Harry C. Coles, Jr., in the investigation conducted in obedience to the above order, was not taken before a competent tribunal, officer or person in any case in which a law of the United States authorized an oath to be administered and that the testimony was not material, and therefore he was not guilty under the

statute. He contends that there was no power vested in the Commission to order the investigation and the proceedings were therefore void and his oath was a mere nullity, first because the Acts of Congress under which the Commission assumed to proceed did not in terms confer the power upon the Commission to make the investigation, and second because at least one of the Acts (1935) was unconstitutional.

But although the contentions have been greatly elaborated, we find no merit in them. Congress conferred broad powers upon the Securities and Exchange Commission in three comprehensive Acts, the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., and the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., and each of the Acts conferred upon the Commission the power to make investigations to aid in its enforcement. The findings of the Commission concerning the status of the Union Electric Company as a public utility company engaged with its subsidiaries as a holding company system in interstate commerce, and as a holding company and as a subsidiary of a holding company, and that the company had registered securities and had invoked the exercise of the Commission's powers by applying to it for exemption under Section 3(a) of the Act of 1935, 15 U.S.C.A. § 79c(a), and had filed financial statements with the Commission and had furnished financial statements constituting in part the basis of the reports of its parent company (the North American Company), establish that the Company was one whose conduct is of public interest and which is, and recognized itself to be, within the terms of the Acts.

█ The information which had come to the Commission and which it found it was necessary and appropriate to investigate is set out in the order and was manifestly a matter for investigation by the Commission within the sections of the Acts specified in the order. Section 12(h) of the Act of 1935, 15 U.S.C.A. § 79l(h), forbids any holding company or subsidiary thereof to make political contributions, and Section 29 of the Act, 15 U.S.C.A. § 79z—3, forbids the making of any false statement or entry in reports or documents required under the chapter. Section 24 of the Act of 1933, 15 U.S.C.A. § 77x, forbids making false statements in a registration state-

ment or "violat[ing] any of the provisions of" the sub-chapter relating to domestic securities; Section 32(a) of the Act of 1934, 15 U.S.C.A. § 77ff(a), forbids the making of any false statement in any report or document required to be filed under the chapter relating to the regulation of Securities Exchanges. But more broadly, each of the Acts confers some regulatory powers upon the Commission in respect to such companies as the Union Electric Company, and in the numerous sections specified in the order the duty was imposed upon the Commission to find the true facts of the matter that had been brought to its attention as that matter manifestly affected the Company and its statements and reports of its conditions and operations filed with the Commission upon which the Commission was required to act.

■■■ Complaint is made that the Commission in making its order for investigation exercised powers conferred upon it by all three of the Acts of 1933, 1934 and 1935. It is true the Commission might have investigated the same question of whether or not the company had the alleged secret fund for political expenditures and whether its accounts were untrue in three investigations, one under each of the Acts, but there was no reason to proceed in such manner. It was proper for the Commission to recite its duties and powers specifically and to refer to the several Acts and the sections by which they were established. The investigation was not rendered invalid merely because the powers and duties of the Commission were established by three rather than by one Act of Congress, or by several rather than by one section. It is also argued that the disbursements from the secret funds of the Company were not in fact all made through the mails or for national, as distinguished from state, political purposes. But such arguments do not reach the validity of the order for investigation. The Commission found the necessity for the investigation in the information which it had received and was therefore required and empowered to proceed and investigate. A witness who has sworn falsely in the investigation may not defend on the ground that the information which gave rise to the investigation was not in all respects confirmed by the proof adduced upon the investigation. A further contention is that the Harry C. Coles, Jr., before whom the oath was taken, was not competent to administer the oath. But it was shown that Mr. Coles was an attorney on the staff of attorneys for the Commission who had taken an oath as such, and by the order under consideration the Commission designated him an officer of the Commission and empowered him to administer oaths and to take evidence for the purpose of the investigation. The sections of the Act invoked by the Commission are specified in the order and the provisions thereof clearly empowered the officer so designated by the Commission to administer oaths and to take evidence upon the investigation.

■■■ It is also urged that the whole scheme of the Act of 1935 (excepting Sections 4 and 5, 15 U.S.C.A. §§ 79d, 79e) was unconstitutional and therefore the oath was a nullity. But the Act was duly enacted by legislative authority and very extensive governmental action has been and is being taken under it affecting vast public and private interests. Many witnesses have been and are being heard in the administration of the Act (some few of whom have been finally convicted for false swearing). Woolley v. United States, 9 Cir., 97 F.2d 258; United States v. Mascuch, 2 Cir., 111 F.2d 602. The appellant was not charged with violating the Act but with false swearing as a witness after he had taken an oath to tell the truth. There is no obvious or manifest unconstitutionality in the Act, and the tribunals set up under its provisions are functioning in fact as a recognized part of the government. We have not failed to observe the arguments made on the point of unconstitutionality, but find no sufficient merit to justify discussion of them at the instance of one convicted of false swearing in an investigation carried on pursuant to the Act's provisions. Kay v. United States, 303 U.S. 1, 6, 58 S.Ct. 468, 82 L.Ed. 607; Howat v. Kansas, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550.

■■■ As the Commission had full power to make the investigation of the Company in respect to the matters specified in the order, and the officer designated by it was competent, 18 U.S.C.A. § 231 was applicable to any false swearing as to any material matter by any witness sworn in the investigation.

The trial of the case before the court and jury commenced June 24, 1940, and ended July 26, 1940. Appellant has not undertaken to make a summary narration of the evidence, and we find the summary for the government (not contradicted in

the reply brief) to be accurate. From the evidence produced by the government it appeared that in October of 1938, information was received by the Securities and Exchange Commission which, if true, would indicate that the Union Electric Company had engaged in certain acts and practices which might constitute violations of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq. On November 9, 1938, the Securities and Exchange Commission ordered an investigation, pursuant to that Act, to determine whether or not such violations had, in fact, occurred. During the course of this investigation, the appellant gave the allegedly false testimony which furnished the basis for the first three counts in the indictment, but as he was found not guilty thereon, there is no occasion to summarize the circumstances surrounding that testimony.

After the investigation had been pursued for a long time, the Securities and Exchange Commission on April 3, 1939, ordered that a public investigation of the same charges be undertaken. However, this proceeding was never commenced. Thereafter, on June 7, 1939, the order for investigation was promulgated by the Commission, pursuant to the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., the Securities Exchange Act of 1934, 15 U. S.C.A. § 78a et seq., and the Public Utility Holding Company Act of 1935, 15 U.S.C. A. § 79 et seq., which is above set forth. This order specified in detail the nature of the information which had been received by the Commission and the sections of the various Acts which appeared to have been violated.

On July 10th and 11th, 1939, the appellant appeared before the officer of the Securities and Exchange Commission named in the order of June 7, 1939, and that he was duly sworn by the officer was established beyond doubt.

Appellant's testimony was correctly stenographically recorded and transcribed and the transcript of it was received in evidence. It shows that he gave the testimony which was specified in counts 4 and 5 of the indictment as false. Appellant did not testify in his own behalf and none of his witnesses gave any substantial evidence to establish the truth of the statements made by appellant under oath in the investigation.

As shown by that transcript of his testimony in the investigation, appellant there testified that no money was obtained by the Union Electric Company or its officers by means of rebates or kick-backs from attorneys employed by the Company. The evidence was that at least four attorneys employed by the Union Electric Company engaged in the practice of paying cash rebates or kick-backs to the appellant. In each instance this practice was of long standing and had been instituted either by him or at his direction. The funds so derived were delivered to him in cash.

In about 1933, the appellant arranged for the payment of an annual retainer in the amount of $38,000 to B. P. Alschuler, an attorney of Aurora, Illinois, by the Union Electric Company and its subsidiaries. Of this sum Alschuler returned to Boehm, or, in rare instances, to one of Boehm's subordinates, about $19,000 per year for a period of about six years. This was accomplished in the following manner: Alschuler would submit bills to the Company purportedly for the retainer; after such bills had been approved by Boehm, the Company would pay them in due course by check. Alschuler would then either cash the check or deposit it in his account and later withdraw currency. Finally Alschuler would return the rebate to Boehm in cash.

The proof of rebates by E. Bentley Hamilton, an attorney of Peoria, Illinois, was substantially the same as in the case of Alschuler. Boehm arranged that an annual retainer of $40,000 should be paid to Hamilton by the companies out of which Hamilton was to, and did, return to Boehm in cash approximately $20,000 a year. This practice continued during the period from about 1930 through the early part of 1939, after the investigation had been started.

Rex Fowler of Des Moines, Iowa, acted in substantially the same manner as Hamilton and Alschuler. In about 1932, Boehm, through an intermediary, arranged that Fowler should bill the companies for legal services at about $12,000 annually, out of which Fowler was to and did return about $6,000 a year in cash to Boehm. This cash was usually received from Fowler by either Albert C. Laun or Harry Williamson, subordinates of Boehm, and by them delivered to Boehm. Fowler's kick-backs covered the period from 1932 to and including 1938.

The rebate practice of Guy C. McMillan of St. Louis, Missouri, was somewhat different. In about 1933, a St. Louis poli-

tician and justice of the peace named Jimmie Miller, approached Boehm's subordinate, Albert C. Laun, with a request for $100 a month "salary", for which Miller was to perform no services other than to use his political influence on behalf of the Union Electric Company. In order to secure funds for paying this "salary" Boehm arranged with McMillan, through Laun, that McMillan, who was employed by the Company as a collection attorney, should receive from the Company a monthly retainer of $100. This was done and McMillan, upon receipt of the retainer, would return it in cash to Laun who in turn would deliver the cash to Miller. In about 1935, the amount of the retainer and rebate was increased to $200 per month and this practice continued until 1937, when McMillan was discharged and the money for Miller was thereafter raised in another manner.

These practices which continued over a period of nearly ten years were established by numerous witnesses who were corroborated by many documentary exhibits.

The appellant swore in the investigation that no money was obtained by the Union Electric Company by means of rebates or kick-backs from persons or concerns supplying materials to the Company or in any other off the record manner. This was specified as perjury in subparagraph (a) of Count Five.

The evidence was that at least $160,000 in cash was raised in this fashion, all of which passed through the defendant's hands. In about 1930, the Union Electric Company was working on a hydro-electric project in Miller County, Missouri, known as the Bagnall Dam. In connection with this project it became necessary to purchase a large number of insulators. Bids were sought and a number of concerns tendered substantially identical bids for substantially identical products. Among them was the Lapp Insulator Company which bid through L. H. Keller of Kansas City, Missouri, who was a good friend of one George K. Miltenberger, a subordinate of Boehm. Through Miltenberger, Boehm approached Keller with a proposition under which Keller's firm might have the insulator contract if he would agree to return to Boehm, in cash, 10% of the purchase price. This proposition was accepted and the agreement was consummated, the cash thereafter being delivered to Boehm by

Keller. After this arrangement had been in effect for a time, an additional plan was devised under which Keller would supply poles to the Union Electric Company and would in turn give to Boehm in cash, either directly or through Miltenberger, 10% of the purchase price of the poles.

The evidence of these transactions was furnished not only by the testimony of numerous witnesses, but also by voluminous bank statements, bank drafts and checks which Keller had used in effecting the rebates.

Evidence was also introduced which established the following facts: The firm of Lawton-Byrne-Bruner Insurance Agency Company of St. Louis, Missouri, handled the insurance business of the Union Electric Company. Herman Spoehrer, who had direct charge of Union Electric Company's insurance placements was approached by Boehm in about 1931 and asked whether there was some way by which cash could be made available out of the insurance account. Spoehrer devised a method by which fictitious survey charges, favorable risk experience credits, savings effected by purchasing long term insurance contracts, and savings effected by securing special discounts on fleet contracts, might be returned to him in cash rather than to the Company on credit memoranda or by check. Pursuant to this arrangement, one Robert Mason Miller, a vice-president of the insurance agency, would from time to time secure cash from the agency for credits due the Union Electric Company and would deliver such cash to Spoehrer.

Mr. Miller kept two private memorandum books in which he made notations as to the amounts of cash delivered to Spoehrer and the dates on which such deliveries were made. Upon receipt of the cash, Spoehrer would initial the appropriate line in Miller's memorandum books. Spoehrer also maintained a private memorandum book in which he recorded, among other things, the amounts he received from Miller, and the ultimate disposition of such funds. Spoehrer either disbursed the money so received from Miller according to Boehm's direction or gave it to Boehm in cash; his memorandum book reflected this in detail.

These transactions regarding insulators, poles, and insurance rebates were established not only by the testimony of nu-

merous witnesses but by voluminous documents and records.

The appellant's testimony at the investigation was that he had at no time padded the expense accounts which he submitted to the Union Electric Company and that he took all of the trips which were listed on such expense accounts. This was specified as perjury in subparagraphs (a) and (b) of Count Four.

The evidence discloses that Boehm submitted monthly expense accounts to the Union Electric Company covering his travelling expense, his expense in entertaining company guests and other miscellaneous items. The government established that at least three expense accounts, so submitted by the appellant were padded and that such accounts listed trips which he could not have taken.

Boehm's expense account for August, 1934, listed an alleged trip by him to New York from August 16 to August 22, for which a charge of $271.20 was made. The government produced evidence which clearly established that from August 17 to August 19, 1934, the appellant was at Bagnell Dam, having flown there and back in the company airplane. Upon refreshing his recollection from the log kept by the pilot of the airplane the witness Laun testified that he recalled having made this trip with Boehm.

Another expense account of the appellant on which was listed a trip and which the evidence shows was padded, was that dated February 27, 1934, on which a trip to New York and Washington from February 8 to February 17, 1934, was charged in the amount of $365.90. The government called numerous witnesses who produced many exhibits, consisting principally of correspondence by Boehm between February 8 and February 17, showing that he was in St. Louis during the period specified.

The evidence showed that appellant also submitted an expense account for September, 1934, in which he listed a trip to New York and Washington for the period from September 17 to September 28. In this connection, the government called many witnesses who produced numerous documents, consisting of correspondence, reports, deeds, notarial records, and office memoranda and notations, from which it appeared that appellant was in St. Louis during the period specified.

The appellant's testimony in the investigation was that a fund in cash had never been maintained by the Union Electric Company for political purposes and that any cash in his office or on his person or in his safe was his own. This was specified as perjury in subparagraph (c) of Count Four.

The evidence showed that large sums of money were secured from various sources and kept by Boehm in cash. In addition to the sources already detailed, substantial sums were realized by Boehm for the political or slush fund from the padding of the expense accounts of other officers of the Union Electric Company. The evidence is that such padding was done on Boehm's instructions and that the money realized therefrom was delivered to him in cash or, in some rare instances, expended at his direction.

At the trial a number of Company employees testified that they had indulged in this practice and had delivered amounts to the appellant, or to others on his instructions, approximating $54,000.

Thus the evidence showed that a fund in cash of $580,000 was collected by Boehm from the following sources: E. Bentley Hamilton contributed about $190,000; B. P. Alschuler contributed about $123,000; Rex Fowler contributed about $44,250; Guy C. McMillan contributed about $6,600; L. H. Keller contributed approximately $72,000; Herman Spoehrer, from the insurance account contributed over $90,000; persons who padded their expense accounts contributed in excess of $54,000.

The appellant testified that he had never made any political contributions, or loans to candidates for public office, on behalf of the Union Electric Company and that he had never made any political contribution in excess of $100. This was specified as perjury in subparagraphs (b) and (c) of Count Five.

The evidence shows that the appellant personally and through his subordinates, Albert C. Laun, Frederick J. Martin, Herman Spoehrer and George Welsh made political contributions aggregating at least $62,365. These contributions were handled in various ways but were invariably made in cash and were not disclosed on the records of the Union Electric Company. The great majority of them were delivered by hand, either by the appellant or by Laun, Spoehrer, Martin or Welsh; others were sent by registered mail, and in some instances they were delivered by instruments of interstate commerce as was par-

ticularly true in the case of the Illinois contributions. The contributions specifically shown by items were to candidates for and incumbents of both federal and state political offices and the circumstances of each contribution shows conclusively that the moneys were delivered as political contributions within the statutes specified in the order for investigation. But it should be noted that there was no attempt by the government to prove any act of bribery of any officer of the state or federal government. The evidence was confined to the matter of the indictment and to the false swearing concerning political contributions for which appellant was being tried.

The appellant introduced the testimony of a number of witnesses who testified to the good reputation of appellant, but he did not produce any witness who contradicted in any substantial matter the evidence introduced by the government. He called a Mr. Hanson, actuary in the Missouri State Department of Insurance, and a Mr. Lacy, public accountant of St. Louis, who both testified that they had examined several insurance vouchers of the Union Electric Company and had found instances in which credits due the company were entered on the vouchers. However, both admitted during their cross examination that at no time had they undertaken to examine all of the books of the Company or of Lawton-Byrne-Bruner Insurance Agency Company or the records of Herman Spoehrer or Mason Miller, to see whether there were additional credits due. The evidence of the government was that the cash refunds secured by Spoehrer for Boehm from the insurance account were kept secret and were not reflected on the books of the Company, hence, the evidence offered was not contradictory of that offered by the government.

The defendant also offered a Mr. Burggrabbe who testified that there was a practice of forwarding documents to the appellant for signature when the latter was out of the city. However, the witness did not state that any of the documents introduced by the government to establish the padding of the appellant's expense accounts had been forwarded to him or signed when he was outside of St. Louis.

There was evidence for the government that the appellant himself admitted to the witnesses, Herman Spoehrer, Charles Spoehrer and Eugene Kropp that in the

Commission's investigation "as the lesser of two evils, he chose the perjury route" and that "he had perjured himself."

Consideration of the testimony, oral and documentary, must convince beyond reasonable doubt, that the appellant committed the perjuries charged against him as found by the jury and although the brief and reply brief for appellant comprise 244 pages, they contain no intimation to the contrary. The points for reversal concern only matters occurring at the trial wherein it is contended that error of law was committed for which there should be reversal.

Among these points it is strenuously urged that the trial court erred in refusing to compel the government to furnish the appellant with transcripts of the entire testimony which certain government witnesses had given in the investigation carried on by the Commission. The government did furnish appellant a complete transcript of all the testimony which appellant himself had given in the investigation but the Commission had not completed its investigation and had not acted upon the information obtained therein at the time of trial and it declined to supply transcripts of the testimony of the other witnesses to the appellant. The trial court refused to compel the production thereof.

The appellant points out that the lawyer witnesses (for instance) who testified on the trial that they had returned to the appellant or his subordinates in cash a large part of the money ostensibly paid to them as attorney's retainers, also testified on cross examination that they had stated to the Commission's investigators that they had not made such return of money.

The contention for appellant is that because such witnesses had testified differently on the other occasion, the government was obliged to supply appellant with a transcript of the former evidence "because it was relevant and material for the purpose of impeachment and would go directly to the weight and credibility of these witnesses."

Of course there is no constitutional provision, Rule of Procedure or statute which requires the government to produce along with its witnesses in criminal prosecutions, the statements the witnesses may have made on occasions other than on the trial, but it is argued that appellant's right to the transcripts was inci-

dental to his right to cross examination derived from the constitutional right to be confronted with the witnesses against him. As a practical matter, most all government witnesses in criminal cases have made statements to investigators, grand juries or others before they are called to the stand to testify. But the witnesses to such extraneous statements of the prosecuting witnesses are not the witnesses with whom the constitution requires the accused to be confronted. On the contrary, a conviction on their testimony would violate the constitution. The trial court's refusal to compel the production of statements made by the government's witnesses before other witnesses on occasions other than on the pending trial manifestly affected no constitutional right of appellant.

The appellant had the right necessarily incident to fair trial to impeach the witnesses against him by compelling admissions from them on cross examination, or, if they denied having given contradictory testimony, by producing impeaching witnesses. But the record discloses that the appellant was not limited in the exercise of this right. On the contrary, each of the witnesses was impeached. Each was cross examined at length for appellant and it was brought out clearly as to the lawyer witnesses (for instance) that they had attempted to deceive the investigators and had stated that no return of part of their fees had been made to the company. Similarly the witnesses to the other false swearing were fully cross examined and impeached by their own admissions. In numerous instances they had been instigated by appellant to deceive the investigators. It is argued that if the transcripts had been in the hands of appellant he might have found something in the words or expressions used by the witnesses on former occasions that would have permitted more effective cross examination. But the issue before the jury was whether the witnesses had in fact turned part of the fee money, or insurance money or contract money, back to the Company, and the examination and cross examination, together with the other convincing evidence adduced by the government, left no reasonable doubt whatever that they had done so and had attempted to deceive the investigators by falsely denying it.

It is conceded for the government that the trial court might in its discretion have ordered production of the transcripts of former testimony notwithstanding the testimony was given in a secret "investigation", as distinguished from a "hearing". But the fact that the rebates or kick backs were made, and that the witnesses who had made them had attempted to deceive the investigators by falsely denying it, both under oath and in colloquy with investigators not under oath, was demonstrated beyond doubt. The contention that appellant would have thrown some light on the issues more favorable to himself if he had had the transcripts is entirely speculative. The evidence affords no ground for any such belief and there is no statement of fact throughout the briefs to justify an inference that such belief really exists.

In Edwards v. United States, 312 U.S. 473, 61 S.Ct. 669, 85 L.Ed. 957, the Supreme Court considered a plea in bar to prosecution for violation of the Securities Act of 1933. Edwards claimed that he had been called as a witness in an investigation like the investigation in this case under the order of the Securities Commission, and that he had there asserted his privilege against self-incrimination, but had none the less been compelled to testify and that the testimony so elicited constituted the basis of the criminal prosecution against him. On the hearing of his plea in bar in which he set up this claim he had demanded the transcript of the proceedings in the investigation and the trial court had refused to compel its production. The Supreme Court held that ruling to be erroneous and reversed. But the court observed that the transcript which Edwards sought to obtain was the very foundation of his plea in bar. It would necessarily disclose whether or not Edwards had been compelled to be a witness against himself contrary to the fifth amendment. Denial of access to such a transcript was denial of compulsory process within at least the intendment of the sixth amendment. But the decision gives no support to the appellant in this case. There is no basis to claim here that the transcripts demanded contain any competent evidence to sustain this appellant's plea of not guilty. Nor did the government predicate any of its charges upon anything contained in the transcripts or make any use of them against appellant, either by offering them or using them to refresh the recollection of the witnesses. Lennon v. United States, 8 Cir., 20 F.2d 490; Little v. United States, 8 Cir., 93 F.2d 401; United States v. Socony-Vacuum Oil Com-

pany, 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129.

Though the Supreme Court in the Edwards case dealt with a transcript which was the very foundation of the plea in the case, it declared that even in such a situation the discretion rested in the trial court to compel the production of only so much of the transcript as was competent evidence on the issue before the court. The court said [312 U.S. 473, 61 S.Ct. 674, 85 L.Ed. 957],

"We assume that the proceeding in which the former testimony was given was a private and confidential investigation of the Commission rather than a hearing which might eventuate in an order.[9] The Commission's refusal to produce the record indicates that the request had been for a complete transcript of the hearing. It rests in the discretion of the trial court to issue an order to show cause why the complete transcript should not be produced, if it deems all of it necessary, or only so much as may fairly make it appear whether the testimony of petitioner before the Commission was a proper foundation for the amnesty claimed. This is not an instance of the inspection of notes or material gathered by a prosecutor for his own use.[10] What is sought is the production as evidence in the hearing on the plea in bar of the very foundation of the plea. We find nothing in this record to indicate the desirability of secrecy so far as the testimony of petitioner is concerned. The Government introduced in the Court of Appeals a purported transcript of petitioner's former testimony without asserting its confidential character then or in the motion and traverse below."

Appellant stresses his reliance upon the decision of this court in Heard v. United States, 8 Cir., 255 F. 829. In that case the chief prosecuting witness had previously made a statement to officers which contradicted his testimony on the trial. When Heard's counsel undertook to cross examine the witness about what the witness had said in his earlier statements objection was sustained and counsel was prevented. This court reversed for this and other errors. But there was no such error

in this case. Here appellant was accorded the right to and did cross examine at length and without any unreasonable limitation about what the impeached witnesses did or did not tell the investigators prior to the trial, both in colloquy and under oath. We have found no case supporting appellant's contention that there was reversible error in the court's refusal to compel production of the transcripts of the secret investigation under such circumstances as are presented here. Cf. Woolley v. United States, 9 Cir., 97 F.2d 258, 262; In re Securities and Exchange Commission, 2 Cir., 84 F.2d 316; United States v. Socony-Vacuum Oil Co., 310 U.S. 150-234, 60 S. Ct. 811, 84 L.Ed. 1129.

However, questions as to the production of transcripts of testimony given by witnesses to investigators for administrative bodies in the course of their investigations (distinguished from hearings), inevitably present themselves for decision in criminal cases. In this case the demand of the defendant was for the transcript of the witnesses' whole testimony and not for the part pertaining to contradictory statements. The appellant was clearly not entitled to all that he demanded and the ruling of the court was not technically or "per se reversible error". United States v. Socony-Vacuum Oil Company, 310 U.S. 150, loc.cit. 234, 60 S.Ct. loc. cit. 849, 84 L.Ed. 1129. In this case where it is apparent from the record that justice has been done, this ruling on the point would suffice, but we do not declare approval of the course which was taken by the trial court. We think the proper course in the situation which was presented to it by defendant's demands is indicated by the Supreme Court in the United States v. Socony-Vacuum Oil Co., supra. Whenever it is timely presented to the court by a defendant in a criminal case that the transcripts of testimony of government witnesses against him given before investigators contain evidence material to his defense at the trial, and demand is made therefor, the court should issue process for the production thereof and should examine the same and should make its rulings as to admissibility or use in the trial of any part

---

[9] "Cf. In re Securities & Exchange Commission, D.C., 14 F.Supp. 417, 418; Id., 2 Cir., 84 F.2d 316, reversed as moot, Bracken v. Securities & Exchange Commission, 299 U.S. 504, 57 S.Ct. 18, 81 L. Ed. 374.

[10] "People ex rel. Lemon v. Supreme Court, 245 N.Y. 24, 156 N.E. 84, 52 A.L. R. 200; cf. Rex v. Holland, 4 T.R. (Durnford & East) 691."

of the whole matter in the light of the transcripts before the court. In making such rulings the court is bound to exercise sound judicial discretion to accord the defendant the fair trial to which he is entitled and at the same time to confine the procedure to consideration of competent, relevant and material evidence. In failing to adhere to that course in this case, and in refusing absolutely to take any steps to compel production of the demanded transcripts, the trial court was in error; but in this case, where it is apparent that no essential ingredient of the offense was in any way dependent upon any matter contained in the transcripts and there is no reason to believe that any matter contained therein was competent, relevant or material matter of defense "to order a new trial would be to violate the standards of Sec. 269 of the Judicial Code, 28 U.S.C.A. § 391, since the substantial rights of the defendant were not affected."

 Transactions Prior to July 31, 1937. Appellant assigns as error that the court received evidence that he was carrying on the practices referred to in his false testimony before the Securities and Exchange Commission was established and granted its powers, and the contentions have been considered. We find them to be without merit. As was said in Woolley v. United States, supra [97 F.2d 262],

"The Securities and Exchange Commission, as a fact-finding body, performs a function similar to that of a grand jury, 'the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation,' Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 471, 63 L.Ed. 979. Such a body is not constrained by technical rules of admissibility. Interstate Commerce Commission v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L.Ed. 860. The test of materiality is whether the false testimony has a natural tendency to influence the fact-finding agency in its investigation. If the testimony has such a tendency, it will support a conviction for perjury. See Carroll v. United States, 2 Cir., 16 F.2d 951."

The transactions and matters which were material to the investigation being conducted under the Commission's order must be determined from that order and the order clearly discloses that the investigation was not confined to ascertaining whether there were grounds for prosecutions for criminal violations of the Acts but was much broader. It was to determine the facts, conditions, practices and matters above referred to, to aid (1) in the enforcement of each of said Acts; (2) in prescribing rules and regulations pursuant to provisions of Section 7 (information to be required in registration statements), 10 (b) (information to be required in prospectuses), and 19(a) (power to make rules and regulations governing the amount of information to be set out in balance sheets, earning statements, etc.) of the Securities Act of 1933, 15 U.S.C.A. §§ 77g, 77j(b), 77s(a), Section 12 (relating to information required in registration statements) and 13 (relating to the nature of periodical and other reports required of registrants) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78*l*, 78m, and Sections 3(d) (relating to power to exempt holding companies and subsidiary companies), 7 (relating to declarations required of holding and subsidiary companies in respect to security transactions), 12 (relating to intercompany loans, dividends, security transactions, sale of assets, proxies and other transactions), 13 (relating to service, sales and construction contracts), 15 (relating to the keeping of accounts and records by holding companies and subsidiaries), 17(c) (relating to restrictions on officers and directors of holding companies and subsidiary companies) 20(a) (relating to authority to make rules and regulations relating to information to be contained in financial statements, etc.), and 23 (relating to recommendation for future legislation) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79c(d), 79g, 79*l*, 79m, 79o, 79q(c), 79t(a), 79w, and other pertinent provisions of each of said Acts; and (3) in securing information to serve as a basis for recommending further legislation concerning any matters to which any of such Acts relate, as may appear to the Commission to be necessary and appropriate; and to determine whether or not there have been violations of the provisions of Section 24 of the Securities Act of 1933, 15 U.S.C.A. § 77x, Section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78ff(a), and of Sections 12(h) and 29 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79*l*(h), 79z—3.

 Furthermore, even in criminal prosecutions evidence of a course of conduct constituting a settled practice engaged in long prior to the commission of the acts

about which complaint is made is proper, and for the same reason such evidence would be material in an investigation such as that ordered by the Commission. See Nyquist v. United States, 6 Cir., 2 F.2d 504, 505, certiorari denied 267 U.S. 606, 45 S.Ct. 508, 69 L.Ed. 810; Haywood v. United States, 7 Cir., 268 F. 795, 807, certiorari denied 256 U.S. 689, 41 S.Ct. 449, 65 L.Ed. 1172; Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas.1914C, 128, and Hood v. United States, 8 Cir., 23 F.2d 472, 475, Syl. 7, certiorari denied 277 U.S. 588, 48 S.Ct. 436, 72 L.Ed. 1002.

 Excluded Testimony. The court excluded testimony offered for appellant to the effect that he had been advised and believed that the Acts of 1933, 1934 and 1935 were unconstitutional and that the investigation was illegal. Counsel for the government inquired whether the offer included evidence of any advice given to appellant or of any conferences had by him, with regard to testifying falsely in the investigation. Counsel for appellant explicitly excluded any such claim from his offer.

The offer was plainly incompetent. One who takes an oath to tell the truth and thereupon swears falsely can not defend against indictment for perjury on the ground that he believed the statute authorizing the taking of his testimony was unconstitutional. When he commits the perjury his offense is complete, even though the statute be subsequently found to be unconstitutional. The law is the same in all cases of false swearing, whether in a court of justice, before a grand jury or before administrative officers acting within the powers conferred by statute. Blair v. United States, 250 U.S. 273, 279, 39 S.Ct. 468, 63 L.Ed. 979; Howat v. Kansas, 258 U.S. 181, 185, 186, 42 S.Ct. 277, 66 L.Ed. 550; Hunter v. State, 158 Tenn. 63, 12 S. W.2d 361, 362, 61 A.L.R. 1148; see Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 358, 361, certiorari denied 303 U. S. 664, 58 S.Ct. 830, 82 L.Ed. 1121; United States v. Norris, 300 U.S. 564, 574, 576, 57 S.Ct. 535, 81 L.Ed. 808.

### The Testimony Concerning Political Contributions.

 It is contended that the political contributions made by appellant were not within the prohibition of 15 U.S.C.A. § 79l(h), or that if prohibited by the terms of the section the section is unconstitutional and therefore his false swearing in respect to them was not material or punishable. We think it is clear that the political contributions shown in the evidence were violative of the section; that the section is not obviously unconstitutional, Electric Bond & Share Co. v. Securities & Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; that the investigation into political contributions was justified by the provisions of the Commission's order other than 15 U.S.C.A. § 79l(h); that the appellant has no standing to defend the perjury charge on this ground and that the contentions present no ground for reversal of appellant's conviction. Kay v. United States, 303 U.S. 1, 6, 58 S.Ct. 468, 82 L.Ed. 607; Blair v. United States, 250 U.S. 273, 279, 39 S.Ct. 468, 63 L.Ed. 979; Howat v. Kansas, 258 U.S. 181, 185, 186, 42 S.Ct. 277, 66 L.Ed. 550; Hunter v. State, 158 Tenn. 63, 12 S. W.2d 361, 362, 61 A.L.R. 1148; see Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 358, 361, certiorari denied 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121; United States v. Norris, 300 U.S. 564, 574, 576, 57 S.Ct. 535, 81 L.Ed. 808.

### The Circumstantial Evidence.

 It is contended that the perjury concerning the padding of appellant's expense accounts was not proved by the quantum of evidence required by law and that the court erred in instructing and in refusing to instruct as to such requirement.

The court instructed: "It is true, also, that in the case of perjury, every material allegation in the indictment may be shown by a single witness except the allegation that the evidence in question was false, and that he did not believe it to be true. This, however, must be shown by two witnesses, or by one witness with circumstances of satisfactory corroboration."

Reference to the statement of the evidence makes it clear that on the issue whether appellant had padded his expense accounts there was one living witness, Albert L. Laun, who saw appellant at the Bagnell Dam in Miller County, Missouri, at a time when appellant's expense account showed him to be in New York, N. Y. In addition there was the evidence of letters, memoranda, vouchers and other documents written or signed by the appellant at St. Louis, Missouri, according to their tenor. Twenty-one witnesses

established their authenticity. The padding of expense accounts by other employees of the Company was shown by many living witnesses and documentary evidence.

The requirement of the law to sustain conviction for perjury was properly stated by the court in its instruction and the proof in support of the charge of perjury in respect to the padding of expense accounts as well as in respect to the other charges of the indictment was sufficient. United States v. Mascuch, D.C.S.D.N.Y., 30 F. Supp. 976; Id., 2 Cir., 111 F.2d 602, 603, Syl. 4, certiorari denied 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416; United States v. Wood, 14 Pet. 430, 39 U.S. 430, 440, 10 L. Ed. 527; Hammer v. United States, 271 U.S. 620, 627, 46 S.Ct. 603, 70 L.Ed. 1118; Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876; Gordon v. United States, 8 Cir., 5 F.2d 943, 945; Behrle v. United States, 69 App.D.C. 304, 100 F.2d 714, 715, Syl. 4; Schonfeld v. United States, 2 Cir., 277 F. 934, 939, certiorari denied 258 U.S. 623, 42 S.Ct. 317, 66 L.Ed. 796; State v. Storey, 148 Minn. 398, 182 N.W. 613, 15 A.L.R. 629; Phair v. United States, 3 Cir., 60 F.2d 953, 954.

It appears that in the part of the court's general instructions relating to the kind of proof by which commission of a crime may be made, the court declared the general rule. that it may be by direct or circumstantial evidence, either of which is sufficient, and the two kinds of evidence were described. That the general law was correctly stated is not. questioned and it is clear from the instructions given that the jury was fully informed of the special exception applicable to the perjury charge. We find no error in giving or refusing instructions concerning the quantum of evidence upon the perjury charge.

Argument of the United States Attorney.

 Complaint is made of certain expressions used by the prosecuting attorney in argument to the jury claimed to amount to improper comment on the appellant's not taking the witness stand in his own behalf. Admittedly the attorney made no direct comment concerning appellant's failure to testify, but it is contended that the assertion in argument concerning books and records and oral testimony which the prosecutor thought established the perjury that "there was no denial of it" can be figured out to have the same effect as direct comment. The whole argument made by

the attorney is not included in the record nor do we have the arguments for the defense. The parts of the argument presented in the record are entirely compatible with the intendment that there was "no denial of it" among the records, books and oral testimony that had been adduced, and do not sustain the charge of improper conduct by indirect reference to appellant's failure to take the stand. Morrison v. United States, 8 Cir., 6 F.2d 809, 811; Murphy v. United States, 8 Cir., 39 F.2d 412, 414; Muench v. United States, 8 Cir., 96 F.2d 332, 336; Paden v. United States, 8 Cir., 85 F.2d 366, 368; Saxton v. United States, 8 Cir., 33 F.2d 65, 67, Syl. 2; Hale v. United States, 8 Cir., 242 F. 891, 894; Vause v. United States, 2 Cir., 53 F.2d 346, 354, certiorari denied 286 U.S. 661, 52 S.Ct. 37, 76 L.Ed. 560; Hood v. United States, 10 Cir., 59 F.2d 153, 155, Syl. 4–6; Milton v. United States, 71 App.D.C. 394, 110 F.2d 556, 558; Baker v. United States, 8 Cir., 115 F.2d 533, 544, certiorari denied 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128; see Cross v. United States, 5 Cir., 68 F. 2d 366; United States v. Di Carlo, 2 Cir., 64 F.2d 15, 18, Syl. 7.

 The court instructed the jury concerning the right of appellant not to take the stand: "The Court instructs the jury that no defendant on trial for crime can be required to take the stand and testify against himself, to produce papers, or to give information which he controls, tending to incriminate himself, or to prove the charge against him. This is his full legal right, and there is to be no presumption drawn against a man, of any kind, if he sees fit not to take the stand to testify. It is just as much his right to. sit still and say nothing as it is his right to walk down the street, and he is not to be criticised for exercising that right. The jury is instructed that within his option, the defendant has the right, under the law, to be sworn as a witness in his own behalf, and testify or not as he may be advised, and, therefore, as a matter of law, you, as jurors, are not entitled to draw any adverse inferences whatsoever against the defendant, Boehm, because he exercised his privilege accorded to him under the law of standing upon the case made against him by the Government, without being sworn or testifying in his own behalf."

This instruction clearly and adequately apprised the jury of the rights of the appellant, Milton v. United States, 71 App.

D.C. 394, 110 F.2d 556, 558, Syl. 2; Cross v. United States, supra; United States v. Di Carlo, and Baker v. United States, supra.

The defendant was fully protected in his right to refrain from testifying.

### The Charge as to the Presumption of Innocence and Reasonable Doubt.

█ The instructions given were as follows:

"The indictment in this case is no evidence of defendant's guilt. An indictment, in a criminal sense, although necessary as a part of the prosecution, under the Constitution, is yet no evidence of guilt. It is a mere formal charge, it is a necessary thing, but it is not to be considered by you as any evidence whatever of the guilt of the defendant. Neither the fact that the defendant has been indicted nor the language of that indictment is binding in an evidentiary way on you, Gentlemen. You are to deduce guilt, if at all, in a case of this character, from the law as the Court gives that law to you, and from the evidence and documents offered on the trial of this cause, when applied to the law as the Court declares it.

"This is a criminal case, Gentlemen, as you know. Any criminal case, whatever its importance, whatever its seriousness, is hedged about with certain age-old rules. The burden of proof to make out the guilt of the defendant on trial in this case is upon the Government. That burden the Government assumes in the beginning and carries throughout to the end, until it has met it by showing to you the guilt of the defendant beyond a reasonable doubt. The defendant, having entered a plea of not guilty, is deemed to be innocent, until you have found him guilty beyond a reasonable doubt. This presumption of innocence attends and protects the defendant throughout the trial, until it has been met and overcome by evidence coming forward in the case which shows and establishes the defendant's guilt beyond a reasonable doubt, and it makes no difference from which side it comes.

"The Court instructs you that a reasonable doubt is a doubt based on reason, and which is reasonable in view of all the evidence, and if, after an impartial comparison and consideration of all the evidence, or from a want of sufficient evidence on behalf of the Government to convince you of the truth of the charge, you can candidly say that you are not satisfied of defendant's guilt, you have a reasonable doubt; but, if, after such impartial comparison and consideration of all the evidence, you can truthfully say that you have an abiding conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs, then you have no reasonable doubt. Putting it in another way, Gentlemen, a reasonable doubt means a substantial doubt, and not the mere possibility of innocence.

"The Court instructs the jury that defendant cannot be convicted upon mere suspicion, conjecture, or speculation on the part of the jury."

A supplemental charge included the following: "In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases. In the present case, the burden of proof is upon the Government to establish every part of it beyond a reasonable doubt, and if in any part of it you are left in doubt, the defendant is entitled to the benefit of the doubt and must be acquitted;"

We find no merit in the contentions that the jury was not properly instructed on reasonable doubt and presumption of innocence.

### As to Character Evidence.

█ The instruction given was: "Evidence has come in as to the previous good reputation of the defendant. If you shall find to your reasonable satisfaction that the reputation of the defendant before the arising of the facts on which the present charge was bottomed was good, then you are to consider such fact, together with the other facts and circumstances of the case, because the office of such goes to the matter of reasonable doubt. This is for the reason that the law agrees that a man of previous good reputation is less likely to commit a crime than is one of bad reputation. You are warranted in considering such evidence, whether the case is clear or whether it is doubtful, for the purpose of raising and making out reasonable doubt. If it shall, when considered with all other evidence, raise a reasonable doubt in your mind as to the defendant's guilt, you should acquit the defendant; but if all the evidence in the case, including that which has been given on the matter of prior good reputation, convinces you of his guilt beyond a reasonable doubt, then his previous

good reputation cannot excuse, mitigate, or palliate such guilt to any extent whatever."

Appellant contends that the court should have charged that "an established reputation for good character standing alone, may create a reasonable doubt although without it the other evidence may be convincing", as requested by appellant. The evidence of appellant's guilt was convincing in this case and in addition he had himself admitted that he had perjured himself deliberately, that is, "as the lesser of two evils." He had, none the less, the right to have his good reputation considered by the jury as the court directed, but as no one could honestly believe, under the circumstances, that proof of his reputation standing alone was sufficient to raise a doubt of his guilt, our criminal law put no obligation on the court to tell the jury that it did or might do so. The instruction given was sufficient and there was no error in refusing to instruct as requested. Winter v. United States, 8 Cir., 13 F.2d 53, 58, 59; Kreiner v. United States, 2 Cir., 11 F.2d 722, certiorari denied 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1152; Haffa v. United States, 7 Cir., 36 F.2d 1, 5, certiorari denied 281 U.S. 727, 50 S.Ct. 240, 74 L.Ed. 1144; Hoback v. United States, 4 Cir., 284 F. 529, 533. Cf. Sunderland v. United States, 8 Cir., 19 F.2d 202.

### Supplemental Instructions.

After the jury had been out some twenty six hours and had failed to reach agreement, the court gave supplemental instructions reminding the jury of the long duration, expense and exhaustive nature of the trial and the desirability of an agreement upon a verdict as the only mode provided by our constitution and laws for deciding questions of fact in criminal cases. The supplemental charge was carefully prepared and was substantially the same as the supplemental instruction approved by the Supreme Court in Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528, and the supplemental instruction given to the jury by Judge Walter H. Sanborn in United States v. Allis, C.C., 73 F. 165, 182, affirmed 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91. It contained no indication of any opinion of the trial judge as to the guilt or innocence of the defendant or suggestion or intimation, direct or indirect, as to the kind of a verdict that ought to be returned. It emphasized that any verdict to which a juror agreed should be his own verdict, the result of his con-

victions and not a mere acquiescence in the conclusions of his fellows. "The court does not desire that any juror should surrender his conscientious convictions". But it did point out that "in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other". "I think you ought to make every honest effort to come to an agreement, at least upon some of the counts, one or more, and to make all the progress you can to that end."

Appellant's contention that the supplemental instruction was coercive and therefore erroneous is greatly elaborated but cannot be sustained. The issues involved in the case were simple and the evidence of appellant's guilt was so overwhelming that there was little room for reasonable doubt. But that he is a man of impressive personality appears in the record and the great ability and energy of counsel in the defense tended to obscure the obvious. It was plainly the duty of the trial judge to seriously and earnestly impress upon the jury that they also had a sworn duty transcending personal inclination, to make true deliverance between the government and the accused. As the judge said nothing to tilt the scale in the jury's hands, either for or against the appellant, it cannot be said that he improperly coerced the verdict. No case is cited for appellant in which such an impartial summing up of the jury's duty to make deliverance has been cited. The giving of the supplemental instruction is sustained. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528; United States v. Allis, C.C., 73 F. 165, 182, affirmed 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91; Nigro v. United States, 8 Cir., 4 F.2d 781, 785. Cf. Stewart v. United States, 8 Cir., 300 F. 769, 785.

### Words and Phrases.

Complaint is made of the use of "padding expense accounts", "kick-backs" from fees and contract payments and commissions, and "slush fund" maintained for political purposes. It is argued and there was testimony that the expressions are not found in some dictionaries and that they were unintelligible to appellant and that some right of appellant was infringed by their use in the indictment and proceedings. They were used to characterize concepts which were conjunctively expressed at the

greater length necessitated by literary English. It undoubtedly is a traditional requirement that proceedings in our courts be carried on in the English language. Though we find no federal statute to that effect, there are state statutes. But the English language is very rich and grows richer as the millions who use it multiply and their vitality vents itself through the medium. The courts are not confined to understanding ancient forms of the language, but dealing with living persons in the present they recognize English as it is spoken and written and understood by the English speaking peoples of our own times. In McMillans Modern Dictionary "slush fund" is defined as "Money collected or spent for corrupt purposes such as * * * lobbying or the like." "Kick-back" is defined "n. (illegal) forced return of part of one's wages (colloq.)", and "padding expense accounts" has reached the standard dictionaries. The appellant's right to be informed of the nature and cause of the accusation against him was not infringed by use of the more modern, shorter characterizations of the conduct which were at the same time particularized at length in legalistic style. We are not persuaded that the charge and the evidence to support it was unintelligible to or not understood by appellant.

### Inconsistency of the Verdict.

We find no merit in the contention that the judgment should be reversed on account of inconsistency in the verdict of acquittal on the first three counts and of conviction on the fourth and fifth. The false swearing charged in the first counts was in December, 1938, and January and February of 1939. The false swearing for which there was conviction was in July, 1939. There was no inconsistency in the conclusion that the proof sustained the conviction as to one and left a doubt as to the other. Whether inconsistency between verdicts on several counts can ever afford ground for reversal of conviction need not be discussed. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Allen v. United States, 4 Cir., 89 F.2d 954; United States v. Capone, 7 Cir., 93 F.2d 840, 841, Syl. 2; United States v. Pandolfi, 2 Cir., 110 F.2d 736, certiorari denied 310 U.S. 651, 60 S.Ct. 1103, 84 L.Ed. 1416.

Having found no error in the judgment and conviction appealed from, it is affirmed.